# United States Court of Appeals
## For the First Circuit

---

No. 00-2475

RITA NETHERSOLE,

Plaintiff, Appellant,

v.

WILLIAM BULGER, ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Cyr, Senior Circuit Judge.

---

Samuel L. Rodríguez, with whom Grayer & Dilday was on brief for appellant.
Peter M. Michelson for appellees.

April 12, 2002

_____

**CYR, <u>Senior Circuit Judge</u>.** Plaintiff Rita Nethersole appeals from the district court judgment which dismissed her section 1983 claims against her employer, the University of Massachusetts ("UMass"), following her transfer to a new administrative position. <u>See</u> 42 U.S.C. § 1983; <u>infra</u> note 3.

**I**

<u>BACKGROUND</u>

In 1995, UMass appointed Nethersole, an African-American, as its state-wide associate vice-president for student affairs. As such, she was responsible, among other things, for promoting faculty/student diversity. During her early tenure, a UMass credit card disappeared. Subsequently it was used, without authorization, by a person whose identity remains unknown, to purchase a laptop computer. The UMass police launched an investigation.

Not long after the credit card fraud, UMass revised its admissions policies (<u>e.g.</u>, by heightening GPA requirements and eliminating special admissions programs). Although the newly appointed UMass President, William Bulger, voiced approval of the revised policies, some minority faculty members reacted with expressions of concern that minority-student recruitment and admissions would be adversely affected. Nethersole conveyed these concerns to her supervisor, Vice President Joseph Deck,

3

who warned her not to air her opinions.  Later, Deck accused Nethersole of leaking information to opponents of the new admissions policies.

On April 1, 1996, Nethersole invited minority faculty and staff to meet and "discuss relevant issues and concerns and perhaps establish an action plan which will relate to our collective needs."  The meeting took place on April 11.  The following day, Nethersole transmitted an e-mail memorandum to UMass Executive Vice-President James Julian, requesting that UMass President Bulger meet with the minority faculty caucus to discuss their concerns regarding, _inter_ _alia_, the UMass admissions and diversity policies.[1]  Later in April, UMass

_____

[1]In pertinent part, the Nethersole memorandum stated:

> The University Caucus of Color, a group of faculty and staff of color, have requested a meeting with the president and five chancellors.  We hope that this meeting could be a conversation [in] which the concerns of the community of color can be detailed to the president and responded to by the president and chancellors.  Those concerns include the issues of diversity among the University leadership[,], . . . University admission policies, responsibility for diversity concerns . . . within the President's Office, Affirmative Action, the report of the Massachusetts Association of Scholars, Ethnic Studies programs, etc.  I envision that this meeting would take approximately two hours and involve twenty-five campus representatives. The Caucus would like to schedule the

4

informed Nethersole's counsel that it was considering whether to terminate Nethersole's employment "for cause," ostensibly a veiled reference to her suspected involvement in the November 1995 credit card fraud and related computer theft.

Thereafter, on September 26, 1996, UMass Vice-President Stephen Lenhardt advised Nethersole in writing that she was to be terminated, based on "credible evidence" derived through an ongoing investigation by the UMass police, that she had been involved in the November 1995 credit card fraud.[2] Lenhardt informed Nethersole that the charges against her were to be aired at a pretermination hearing, which was subsequently held on October 4, 1996.

On November 22, 1996, Lenhardt sent Nethersole another letter, advising that notwithstanding "numerous concerns <u>over</u> <u>the</u> <u>past</u> <u>months</u> regarding [her] conduct," UMass was rescinding its termination decision "at this time," and reassigning her to its UMass-Boston campus as the Assistant Dean of Graduate Studies, with no reduction in salary. (Emphasis added.) The Lenhardt letter neither mentioned nor described the findings

---

meeting for the early part of the day.

[2]The only "credible evidence" described in the Lenhardt letter was the assertion that Nethersole had assured the UMass police that though she did not steal the credit card, she knew who did, yet refused to identify the culprit.

resulting from Nethersole's pretermination hearing.  Nethersole regarded the announced transfer as a demotion.

In due course, Nethersole instituted the present action against, inter alios, UMass and its Board of Trustees, as well as Bulger, Julian, and Lenhardt, claiming that her November 1996 transfer to UMass-Boston constituted (i) retaliation for exercising her First Amendment right to free speech, see U.S. Const. amend. I, and (ii) a deprivation of her liberty or reputational interest, without due process of law, see id. amend. XIV.  Additionally, Nethersole alleged that certain press comments were defamatory, hence actionable under state law.

In due course, the district court dismissed all the federal claims, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Finally, the state-law defamation claim was dismissed due to lack of supplemental jurisdiction, see 28 U.S.C. § 1367(c)(3), and Nethersole appealed.

**II**

**DISCUSSION**

Nethersole contends that the amended complaint states an actionable First Amendment violation, under section 1983, in that it alleges retaliation for her exercise of free speech,

_viz_., the April 12, 1996, memorandum to James Julian.[3] She points to the suspicious circumstance that, within weeks of her memorandum, her attorney received notice that UMass was considering whether to terminate her employment "for cause." She reasons that notwithstanding the UMass attempt, some seven months later, to predicate its termination decision upon her alleged complicity in the November 1995 credit card fraud, the temporal proximity alone provides a sufficient circumstantial causal link between her exercise of free speech and the ensuing transfer. We agree.

We review the Rule 12(b)(6) ruling _de novo_, accepting all factual allegations in the complaint and drawing all reasonable inferences in Nethersole's favor. _See_ _Alternative Energy, Inc._ v. _St. Paul Fire and Marine Ins. Co._, 267 F.3d 30, 33 (1st Cir. 2001). The dismissal is to be affirmed "only if, under the facts alleged, [Nethersole] cannot recover on any viable theory." _Blackstone Realty LLC_ v. _FDIC_, 244 F.3d 193, 197 (1st Cir. 2001) (citation omitted).

---

[3]_See_ _Kelley_ v. _LaForce_, 279 F.3d 129, 134 (1st Cir. 2002) ("Section 1983 provides a cause of action for . . . money damages from a defendant who acted under color of state law to deprive plaintiff of a right guaranteed by the Constitution or by federal law."); _Cont'l Cas. Co._ v. _Canadian Universal Ins. Co._, 924 F.2d 370, 377 (1st Cir. 1991) (observing that UMass is a "state actor," hence subject to suit under § 1983).

Three inquiries must be undertaken in assessing whether the challenged employment action contravened the First Amendment right to freedom of speech: <u>whether</u> (i) the speech Nethersole engaged in can be considered that of a public employee on a matter of public concern, or merely related to matters primarily of concern to employees (<u>e.g.</u>, internal working conditions); (ii) Nethersole's interest in speaking, as well as the public interest, outweigh any legitimate governmental interest in the efficient performance of its public function; and (iii) the speech was either a motivating or substantial factor in the adverse employment action. See <u>Padilla-Garcia</u> v. <u>Guillermo Rodriguez</u>, 212 F.3d 69, 78 (1st Cir. 2000); <u>see also</u> <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 911-13 (1st Cir. 1993).[4] Unlike the first two criteria, which often involve issues of law amenable to resolution by the court, <u>see</u> <u>Connick</u> v. <u>Myers</u>, 461 U.S. 138, 148 n.7 (1983); <u>Pickering</u> v. <u>Bd. of Educ.</u>, 391 U.S. 563, 568 (1968); <u>O'Connor</u>, 994 F.2d at 912; <u>Gorman-Bakos</u> v. <u>Cornell Coop. Extension of Schenectady Cty.</u>, 252 F.3d 545, 557 (2d Cir. 2001),[5]

---

[4]UMass does not contend that Nethersole did not adequately allege that her transfer was sufficiently "adverse" to state an actionable First Amendment retaliation claim.

[5]UMass argues on appeal that Nethersole's April 1996 memo was not "protected speech," as a matter of law, since it contained simply a routine scheduling request for a meeting with President Bulger, and although Nethersole and her caucus might have engaged in protected speech at such a meeting, her memo did

the "causation" or "motivation" element normally presents a factfinding responsibility for the jury.  See O'Connor, 994 F.2d at 913; Shands v. City of Kennett, 993 F.2d 1337, 1343 (8th Cir. 1993).

The district court dismissed the amended complaint due to its failure sufficiently to allege that Nethersole's opposition to the new UMass admissions policies was a motivating factor in the later UMass decision to relieve her of her position as the associate vice-president for student affairs responsible for promoting faculty/student diversity.  As the rationale for its Rule 12(b)(6) dismissal, the district court pointed to the seven-month lapse between the April memorandum Nethersole transmitted to Julian and her ensuing transfer in November.

In section 1983 cases asserting a First Amendment claim, the plaintiff need only allege facts sufficient to enable a reasonable inference that the employer retaliated, at

---

not address the substance of their "concerns."  We disagree. Given the context of the recent changes in the UMass admissions policies, as well as Nethersole's alleged vocal opposition to the changes, the reference in the April 1996 memo to the caucus's "concerns" with faculty/student "diversity" arguably implied continuing opposition to the new UMass policies, thereby possibly implicating a matter of public concern. See supra note 1.  We need not resolve the issue here.  It suffices that, at the Rule 12(b)(6) stage, the facts alleged in the Nethersole complaint support a reasonable inference that she engaged in constitutionally protected speech.

least in part, in response to constitutionally protected speech. Once the plaintiff alleges — and thereafter proves — that such retaliation was "a" motivating factor, the burden shifts to the defendants to demonstrate, by a preponderance of the evidence, that the adverse employment action would have obtained regardless of the protected conduct engaged in by the plaintiff; e.g., here, by reason of the suspicions relating to the November 1995 credit card fraud. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Beattie v. Madison Cty. Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001). The allegations in the amended Nethersole complaint meet that minimal pleading standard, entitling Nethersole to conduct discovery regarding the section 1983 causation element.

First, we assess the April 1996 Nethersole memo in the context of the events which allegedly preceded it, particularly her discussions with Vice President Deck, and Deck's explicit warning that Nethersole refrain from voicing publicly her concerns regarding diversity. Further, Deck questioned Nethersole's loyalty as a team player, charging that she leaked information to opponents of the new admissions policies supported by incoming President Bulger.[6] Thereafter, UMass

_____

[6]UMass contends on appeal that these allegations are irrelevant to the retaliation claim since Deck was no longer vice-president for academic affairs at the time Nethersole was

10

excluded Nethersole from all policymaking discussions relating to the new admissions policies, even though faculty/student diversity issues constituted a prime focus of her employment.

Second, although seven months passed between the April memo and Nethersole's transfer, at the preliminary Rule 12(b)(6) stage in the proceedings the temporal disparity does not <u>compel</u> the conclusion, as a matter of law, that Nethersole's diversity concerns could not have played <u>some</u> <u>role</u> in the UMass decision to replace her as associate vice-president for student affairs, a position which specifically entailed responsibility for diversity issues. Notwithstanding unsubstantiated accusations that Nethersole was complicit in the computer theft, which arguably would have made her unfit for <u>any</u> position at the university — rather than a mere job transfer — UMass transferred Nethersole from a position in which she was directly involved with <u>diversity</u> <u>policy</u> to a more peripheral position outside the president's office. Thus, the thematic link between the substance of Nethersole's speech and the particular corrective

---

transferred, thus could not have participated in the transfer decision. We disagree. Although ultimately this may prove to have been a valid reason to dismiss Deck as a party defendant, it does not necessarily follow that discovery could not disclose that Deck recorded or otherwise reported these encounters with Nethersole to other UMass officials, and that any such reports later motivated others to target Nethersole for investigation by the UMass police and/or to demote her.

11

action taken by UMass diminishes the evidentiary significance of the seven-month time lapse, especially since UMass noted in November 1996 that its concerns with Nethersole had extended "over the past months."  (Emphasis added.)

Further, the Nethersole complaint alleged no uninterrupted seven-month retaliatory lapse.  Rather, it asserted that, within a matter of weeks following Nethersole's April 1996 memo, UMass announced that it was considering terminating her employment.  "[C]lose temporal proximity between two events may give rise to an inference of causal connection." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998).  Although the ostensible basis for the UMass announcement related to the UMass police investigation into the November 1995 computer theft, Nethersole's ongoing opposition to the new admissions policies represents a potential intervening cause. See Springer v. Seaman, 821 F.2d 871, 876 (1st Cir. 1987) (noting that proximate causation issue in § 1983 action, including viability of asserted superseding causes for employment decision, normally generates jury issue).  In reviewing a Rule 12(b)(6) dismissal, we may neither ignore the allegation of temporal proximity, nor presume that it is a mere coincidence.

Finally, although UMass claims that its employment action was motivated solely by Nethersole's conduct in relation to the computer theft investigation, the amended complaint questions UMass's credibility in this regard. UMass first announced Nethersole's termination in September 1996, due to "credible evidence" that she was involved in the computer theft. Nevertheless, two months later, without releasing any findings arrived at during her pretermination hearing, UMass implicitly acknowledged that the evidence disclosed at the termination hearing was insufficient to warrant termination, while vaguely stating that it had "numerous concerns over the past months regarding [Nethersole's] conduct," and implicitly threatening her with future termination (viz., "the University has decided not to terminate you at this time") (emphasis added).

Among the inferences arguably suggested by these allegations are the following: (i) UMass trumped up the credit card fraud charges as a cover for its attempted First Amendment retaliation; (ii) its lingering "concerns" included Nethersole's propensity to question the existing UMass diversity policies; and (iii) the UMass threat, along with her transfer to a position which no longer involved diversity matters, were designed to chill future protected speech by Nethersole on these matters. Absent an opportunity to conduct appropriate

13

discovery, however, the paper trail UMass created in documenting the UMass police investigation, as well as its pretermination decisionmaking process, remain within the control of UMass.

Given the facts alleged in the complaint, we understand the district court's inclination to believe that the strength of Nethersole's First Amendment claim is open to considerable doubt, especially as concerns the causation element. Nevertheless, a complaint need not set forth all evidentiary facts, given that discovery proceedings may yet prove fruitful. Thus, while appellees may well decide to submit a summary judgment motion following further proceedings on remand, at the present stage of the proceedings, the dismissal for failure to state a claim was inappropriate.[7]

---

[7]Nethersole also appeals from the district court order disallowing the claim that she was deprived of a liberty interest, without due process of law, due to the UMass decision to transfer her to another position on account of the credit card fraud charges, which she says were false. Although the claim was properly dismissed for numerous other reasons, see, e.g., Beitzell v. Jeffrey, 643 F.2d 870, 879 (1st Cir. 1981) (noting that even where employer seeks to deprive plaintiff of property or liberty interest, due process is satisfied where plaintiff is accorded a hearing and an "opportunity to clear [her] name"), we simply note that Nethersole did not allege that UMass ever disseminated, to other persons, the September and November 1996 letters in which it described the charges and the purported grounds for her termination and/or job transfer. See Hardemon v. City of Boston, 144 F.3d 24, 28 (1st Cir. 1998) ("Not only must there be a creation of false information by the employer, there also must be a dissemination of that information by the employer before there is a depreciation of an employee's liberty interests. . . . The protection of liberty interests is

14

**The district court order dismissing the First Amendment claim in the amended complaint, and dismissing the state-law claims for lack of supplemental jurisdiction, is hereby vacated and the case is remanded for further proceedings on all such claims, consistent with this opinion. The order dismissing the due process claim in the amended complaint is affirmed. Costs to appellant.**

**SO ORDERED.**

---

[not] violated [] by the presence of adverse information in a personnel file, standing alone . . . .") (emphasis added; citation omitted; quotation omitted); Silva v. Worden, 130 F.3d 26, 32-33 (1st Cir. 1997) (same).